## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-        (JKS) |
| Enigma Securities, Ltd., and Makor Securities London Ltd., | |
| Defendants. | |

### COMPLAINT

The PCT Litigation Trust ("Plaintiff" or "PCT")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against Defendants Enigma Securities, Ltd. and Makor Securities London Ltd. (collectively, Defendants Enigma Securities, Ltd. and Makor Securities London Ltd. are referred to herein as "Defendants" or "Enigma") (collectively, Enigma and Prime are referred to herein as the "Parties"), pursuant to sections 547 and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), seeking to avoid and recover all preferential

---

[1] The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2] The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

transfers of property made by the Debtors to or for the benefit of Enigma plus interest, attorneys' fees, and costs.  To the extent that Enigma filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtors or the Debtors' estates (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count III below.  PCT alleges as follows:

## INTRODUCTION

1.     Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime in June 2023 and Prime filed for bankruptcy in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the fiat or crypto owed to them.  But Prime's most important customers got out early before Prime stopped accepting transfer requests. Enigma was one of those customers.  In a series of transactions from May 16, 2023 to June 21, 2023, Prime transferred $244,402,467.73 USD to or for the benefit of Enigma (collectively, the "Transfers").

2.     After receiving certain of the Transfers during the Preference Period, Enigma transferred $150,826,209.03 of potential subsequent new value to Prime.  While it is Enigma's obligation to establish any possible affirmative defenses, including any subsequent new value defense, Enigma's preference exposure is no less than $93,576,258.70.

3.      While the general public did not learn the full truth about Prime's financial problems until Nevada FID shut down Prime on June 21, 2023, rumors had been circulating amongst certain key players in the crypto industry that things were wrong at Prime in the weeks and months leading up to Prime's downfall.

4.      Enigma was one of the parties which had advance notice of the issues at Prime. Leading up to and during the 90-day period prior to the filing of the Debtors' Chapter 11 Cases,[3] Enigma had complained to Prime about the delays Enigma was experiencing in completing transactions Enigma had requested through Prime.

5.      On June, 8, 2023 (during the Preference Period), Enigma unequivocally expressed its concerns about Prime's financial condition by requesting to "have a quick call with [Prime] to *discuss asap PT market rumors*":



6.      Although Prime tried to downplay these "market rumors," Enigma clearly was not

---

[3]  Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

persuaded and followed up with Prime to check if "everything [was] good on [Prime's] side":



7.     Enigma also repeatedly stressed to Prime the urgency with which Enigma needed to complete its transaction requests during the Preference Period—stating to Prime that Enigma "really need[ed]" all of outgoing wire requests "*to be release[d]* [*sic*] *now !*":





Message

"Samuel Leyne" <"sleyne@enigma-securities.io"@Slack> To ▮▮▮▮▮▮▮▮▮@primetrust.com"@Slack>, ▮▮▮▮@primetrust.com"@Slack>, ▮▮▮▮▮@primetrust.com" <▮▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮▮@primetrust.com"@Slack>, ▮▮▮▮@primetrust.com" <▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com" <▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ' ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ' ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com"@Slack>, "jean-baptiste Mateo" <"jbmateo@Enigma-securities.io"@Slack>, "Benjamin Borello" <"bborello@enigma-securities.io"@Slack>, "Benjamin Konqui" <"bkonqui@enigma-securities.io"@Slack>, "Guy Augarde" <"gaugarde@enigma-securities.io"@Slack>

need all funds to be release now !

*June 15, 2023 5:23 PM (Eastern)*

8. Plaintiff brings this adversary proceeding (the "Adversary Proceeding") pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Enigma, made during the Preference Period. These transfers constitute preferential transfers and are avoidable under section 547 of the Bankruptcy Code. Pursuant to section 502(d) of the Bankruptcy Code, Plaintiff also seeks to disallow any claims filed or held by Enigma in these Chapter 11 Cases unless and until Enigma has relinquished to Plaintiff all property it received in transfers that are determined by the Court to be avoidable and recoverable.

9. Enigma operates a platform which provides financial technology companies and financial institutions with access to the digital asset market. To effectuate these services, in 2020, Enigma and Prime began discussions about starting a business relationship. In 2022, the Parties fully realized this partnership—Enigma used Prime's services to obtain access to the U.S. banking system, and Prime used Enigma's services to obtain liquidity in the crypto markets.

10. The relevant agreements that governed Prime and Enigma's relationship during the Preference Period are: (i) Prime Trust Master Services Agreement, revision date August 30, 2022

(the "MSA");[4] and (ii) Services Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "Custodial Agreement")[5] (collectively, the "Agreements").

11.     Although Prime was a Nevada state-chartered trust company, Enigma never sought or received any trust or fiduciary services from Prime.  The Agreements make clear that no fiduciary relationship existed between the Parties.

12.     The MSA explicitly states that it "***does not create a . . . fiduciary or employment relationship between the parties.***"  Ex. A, MSA, § 14.1 (emphasis added).

13.     The Custodial Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . . with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]***"  Ex. B, Custodial Agreement, § 2.7(b) (emphasis added).

14.     The Agreements establish that the Parties always maintained a strictly debtor-creditor relationship.

15.     The fiat that Enigma transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat Enigma transferred to Prime with fiat from Prime's many other customers and with Prime's own fiat generated from its business operations.

16.     Prime attempted to keep track of commingled fiat transferred by Enigma (and other customers) with an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

---

[4]     A copy of the MSA is attached as Exhibit A.

[5]     A copy of the Custodial Agreement is attached as Exhibit B.

17.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and crypto that Enigma transferred to Prime.

18.     The third-party expert retained by Plaintiff in this matter, James P. Brennan, also has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat that Enigma transferred to Prime from the fiat transferred to Prime by Prime's other customers or from Prime's own fiat.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[6]

19.     Bank account statements confirm that the fiat transferred from Prime to Enigma during the Preference Period was not the original fiat that Enigma had transferred to Prime.  *See id.*, ¶¶ 63–108.  Rather, these Transfers consisted of fiat from the commingled, omnibus bank accounts in Prime's name.  *Id.*

20.     Moreover, in December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[7] holding more than 11,082 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.*, ¶ 45.

21.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.*, ¶¶ 47–52.

22.     Prime executives have admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime

---

[6]     A copy of the Brennan Decl. is attached as Exhibit C.

[7]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime

created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat

wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the

replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

> Q:     When it says funds transfer. . . and it says "wire, wire, wire."  Do you see
> that?
>
> A:     Yes.
>
> Q:     *There were no wire transfers; right?*
>
> A:     *Yes.*
>
> Q:     *Just to be clear.  Yes, there were not any wire transfers in connection with
> these [Liquidity Provider] purchases; right?*
>
> A:     *Yes, there were no wire transfers.*

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del.

Mar. 29, 2024) (the "███ Dep."), 164:22–165:10 (emphasis added).

23.    Prime's use of its fiat transferred by other customers to purchase replacement ETH

left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled

fiat from Enigma and other Prime customers.  *See* Ex. C, Brennan Decl., ¶¶ 47–52.

24.    Prime's falsified wire transfer entries to cover its replacement ETH purchases,

coupled with Prime's failure to properly reconcile and record other transactions on its Internal

Ledger, have resulted in Prime being unable to trace fiat and crypto to any specific deposits,

withdrawals, or transfers that were made by any particular customer, including Enigma.  *See id.*,

¶¶ 31–43, 53–62, 108.

25.    Much of the testimony corroborating the fact that Prime executives used fiat

transferred to it by customers to purchase replacement ETH from Liquidity Provider comes from

████████████████████, Prime's former Senior Vice President of Operations.    ████was the first person to discover the issue with the 98f Wallet and, with the knowledge and at the direction of other Prime executives, personally executed each of the replacement ETH purchases with Liquidity Provider and intentionally falsified Prime's Internal Ledger to conceal those purchases. Interestingly, ████ joined Enigma shortly after Prime filed the Chapter 11 Cases.

26.    Prime's Transfers to Enigma during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

27.    The Transfers, culminating in a demand by Enigma for a release of all funds, also gave Enigma an unfair advantage over Prime's many other creditors that did not, or could not, execute similar transactions to withdraw the fiat or crypto they had transferred to Prime.

28.    Because the Parties' relationship was strictly a debtor-creditor relationship, certain of the Transfers to Enigma during the Preference Period must be returned to the Debtors' estates pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

29.    During the course of this Adversary Proceeding, Plaintiff may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Enigma that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiff intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Enigma and, accordingly, reserves the right to amend this Complaint.

## PARTIES

30.    Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the

United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").  [*See* Docket No. 694.]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*. at § 1.118.

31.    Defendant Enigma Securities Ltd. is a company registered in England and Wales.  Enigma Securities Ltd. maintains a registered address in London.

32.    Defendant Makor Securities London Ltd. is company registered in England and Wales.  Makor Securities London Ltd. maintains a registered address in London.[8]

33.    In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan Supplement"), Prime identified preference claims against Enigma as "Exempted Preference Claims", and thus, these claims were not released on the Effective Date of the Plan.[9]

---

[8]    Defendant Enigma Securities, Ltd. and Defendant Makor Securities London Ltd. are affiliates.  Both are named Defendants in this Adversary Proceeding because both companies employed many of the same individuals and these individuals used domains associated with both Enigma Securities, Ltd. and Makor Securities London Ltd. in their interactions with Prime, including interactions related to the Transfers.

[9]    Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  Prime reserves its right to maintain the confidentiality over the remainder the "Exempted Preference Claims" identified in the Plan Supplement.

## JURISDICTION AND VENUE

34.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.* at §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

35.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C.  § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

36.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

37.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

38.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

39.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

40.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.   All transactions are recorded on the blockchain and are publicly available.   When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order—thus, a "block"-"chain."

41.     There are many different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

42.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the

complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

43.     "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

44.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

45.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

46.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

47.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



48.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to effectuate transactions in the crypto kept on the digital wallet.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

49.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" digital wallet.

If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.    Prime's Business Operations

50.    Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

51.    Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

52.    In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

53.    Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

54.    Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service"—serving as an "on-and-off ramp" and "payment rail" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

55.    Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

56.    Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

II.     **Enigma Engaged Prime to Gain Access to the U.S. Banking System and Prime Engaged Enigma to Obtain Liquidity**

57.     Enigma is a crypto liquidity provider.  In its own words, Defendant Enigma Securities Ltd. was "[c]reated in 2017 as a subsidiary of the Makor Group, a leading cross-asset brokerage group, [and] is among the world's first institutional-grade providers of digital-assets liquidity, bridging the gap between traditional finance and blockchain." *See Global Presence*, Enigma, https://enigma-securities.io/.

58.     Enigma further describes its business as follows: "Enigma's proprietary trading and execution technology is built to bridge the TradFi and DeFi UX.  Using quant models, ultra low-latency architecture, and the widest range of APIs, Enigma has created an environment where clients can access the vast trading experience acquired on Traditional Markets and apply it to the digital-asset and DeFi markets." *About Us*, Enigma, https:// https://enigma-securities.io/about-us/.

59.     Enigma first sought out Prime's services in or around April 2020.  Enigma planned to use Prime to gain access to the U.S. banking system and to facilitate fiat transactions in connection with Enigma's liquidity services.

60.     According to "know-your-customer" documents Enigma completed as part of its onboarding with Prime, Enigma stated that it would use Prime "to do wires in USD mostly domestic (80%), and other internationals (20%)" and anticipated that it would conduct "5–20 million USD" monthly volume of transactions through Prime:

| BUSINESS ACTIVITY INFORMATION | |
|---|---|
| Referred By Or Prime Trust Sales Representative: | Wilfred Daye |
| Main Company Contact: | Josipa DEAK COO Chief Operating Officer |
| Email: jdeak@enigma-securities.io | Telephone: |
| Nature of Business of the Company: | **Enigma Securities is an OTC crypto broker for** |
| Purpose of the Account: | open another usd account |
| Please list any associations the company (or any of it's beneficial owners or signers) have with previous or current accounts with Prime Trust: Wilfred Daye works with us | |
| Sources of assets / income: | Source of funds for Enigma is capital contribution from Makor Partners Source of funds for Makor Partners is capital contribution from Makor Holdings |
| Description of how the organization interacts with digital assets if applicable and how the account at Prime Trust will be used: to do wires in USD mostly domestic (80%), and other internationals (20%) | |
| Where does your firm do business: | Enigma is based in UK at 7/8 Saville Row, W1S 3PE, London, |
| Anticipated types of assets deposited into account: | BTC |
| Anticipated monthly volume (in USD): | 5-20 million USD |
| Anticipated trading patterns (e.g., deposit bitcoin, withdraw USD): | wire USD outgoing and ungoing |
| Anticipated monthly number of transactions (incoming): | 100-300 |
| Anticipated monthly number of transactions (outgoing): | 100-300 |

61.     While Enigma and Prime took the initial steps to create a business relationship in 2020, Enigma did not begin regularly using Prime's services at this time and would not do so until a few years later.

62.     In 2022, the Parties restarted their business relationship.  Whereas Enigma wanted to use Prime's services to gain access to the U.S. banking system, Prime now also wanted to use Enigma's liquidity services for Prime's business operations.

63. Thus, Prime and Enigma began discussions about Enigma onboarding Prime as a client, as reflected in the below September 13, 2022 communication between the Parties:



64. On October 5, 2022, as part of Prime's renewed efforts to onboard Enigma, Prime alerted Enigma that Prime "had update[ed] all of [its] agreements" with its customers and that it was "moving all of our integrators from previous agreements to our new MSA":

| From: | ▮▮▮▮▮▮▮▮@primetrust.com] |
|---|---|
| Sent: | Wed 10/5/2022 12:31:34 AM (UTC+01:00) |
| To: | wdaye@enigma-securities.io[wdaye@enigma-securities.io]; jdeak@enigma-securities.io[jdeak@enigma-securities.io]; sleyne@enigma-securities.io[sleyne@enigma-securities.io]; bzennou@enigma-securities.io[bzennou@enigma-securities.io] |
| Subject: | Enigma Securities <> Prime Trust ~ New MSA |

Greetings,

I hope you're doing well. Prime Trust is in the process of updating all of our agreements. Upon review I couldn't find a signed agreement between us but do see you have an active account.

Prime Trust is moving all of our integrators from previous agreements to our new MSA. A copy for you and your team's review is at the following link https://www.primetrust.com/legal/msa

I wanted to touch base to get your thoughts on the new MSA and continuing our business partnership.

Sincerely,



**Senior Account Manager**

primetrust.com

65.    At this time, due to the Parties' initial attempt at creating a business relationship, Prime noted that it "couldn't find a signed agreement between" the Parties "but d[id] see [that Enigma] ha[d] an active account" with Prime.

66.    Nevertheless, Prime was clear in communicating to Enigma that if the Parties wanted to "continu[e] [their] business partnership," then the terms of Prime's new MSA would govern their relationship.

67.    Prime and Enigma continued their negotiations—about Prime onboarding Enigma as a client, and Enigma onboarding Prime as a client—throughout the end of 2022.

68.     On the liquidity services front, after some back and forth between the Parties regarding terms, they agreed to move forward without signing any documents and to let Enigma's standard Terms of Business govern Enigma's provision of liquidity services to Prime. Internal Prime communications from November 18, 2022 confirm that Prime received "formal approval to move forward with Enigma" and that, because of "[t]he way their online Terms of Business are drafted . . . no signature [was] required":



69.     Similarly, the Parties also moved forward with Prime's provision of services to Enigma without signing any documents.

70.     Enigma did not object to Prime's above-referenced efforts to have Enigma agree that the MSA governed the Parties' relationship. Accordingly, by moving forward with the business relationship, Enigma acceded to Prime's request that the MSA governed.

71.     Beginning in March 2023, Enigma began transferring assets with Prime.

72.     To complete trades for its clients, Enigma utilized Prime's API service to route wire transfers directly to and from Prime's bank accounts.  Once Prime confirmed receipt of an incoming or outgoing wire transfer, Enigma then completed the requested trade on its own platform.

73.     To facilitate these transfers, Prime and Enigma established a communication channel using the platform Slack, wherein each party communicated to confirm receipt and approval of incoming and outgoing wires.

### III.    The Preferential Transfers to Enigma

#### A.    The Agreements Make Clear that the Parties' Relationship was Strictly a Debtor-Creditor Relationship

74.     The Agreements governed the Parties' relationship during the Preference Period.

75.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* <u>Ex. B</u>, Custodial Agreement, § 16 ("This Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

76.     The Agreements make clear that the Parties created a debtor-creditor relationship.

77.     The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and Enigma.

78.     For example, the MSA explicitly states: "The Parties are independent contractors. The Agreement ***does not create a . . . fiduciary or employment relationship between the Parties***." <u>Ex. A</u>, MSA, § 14.1 (emphasis added).

79.     The MSA also provides that "nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary."  *Id.*

80.     Additionally, the Custodial Agreement permitted Prime to take certain actions with assets transferred to it by Enigma which are entirely antithetical to those which would be authorized under a trust or fiduciary relationship.   For example, the Custodial Agreement authorizes Prime to:

> *[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk.* Without limiting the foregoing, *Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency*[.]

Ex. B, Custodial Agreement, § 2.7(b) (emphasis added).

81.     Enigma also expressly agreed through the Custodial Agreement "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*

82.     Thus, the Parties' operative Agreements make clear that the relationship between Prime and Enigma was, at all relevant times, strictly a debtor-creditor relationship.

**B.     The Transfers**

83.     During the Preference Period, Prime transferred to Enigma $244,402,467.73 in fiat currency via 234 outgoing wire transactions.[10]   *See* Ex. C, Brennan Decl., ¶ 67.

84.     During the Preference Period, Enigma transferred to Prime $150,826,209.03 in fiat currency of potential subsequent new value.  *See id.*, ¶ 70.

85.     Thus, Enigma's preference exposure is no less than $93,576,258.70.  *Id.*

86.     Prime's API log audit data establishes that Enigma, using the email addresses bborello@enigma-securities.io,  bkonqui@enigma-securities.io,  gaugarde@enigma-securities.io,

---

[10]    The Prime entity which made the Transfers to Enigma was Prime Trust, LLC.

Jmatteo@oscargruss.com, and sleyne@enigma-securities.io, directed each of the Transfers from Prime to or on behalf of Enigma. *See id.*, ¶ 68.

### C.    Enigma was Alerted to Prime's Financial Issues

87.     As further detailed in this Complaint (see Section V, *infra*), leading up to and during the Preference Period, rumors about Prime's precarious financial condition began to circulate amongst those in the crypto industry.

88.     Communications between the Parties both before and during the Preference Period suggest that Enigma may have been alerted to the fact that Prime was experiencing financial issues before Nevada FID shut down Prime on June 21, 2023.

89.     For example, as early as April 26, 2023 (and before the Preference Period even started), Enigma voiced concerns to Prime about Prime "taking so long" to complete transaction requests Enigma initiated:



Message

I dont understand why its taking so long

*April 26, 2023 9:49 AM (Eastern)*

90.     On May 31, 2023, Enigma again voiced its concerns to Prime, complaining that it had "[b]een 5 days without a single trade" completed through Prime:



Been 5 days without a single trade

*May 31, 2023 2:00 PM (Eastern)*

91.    On June 8, 2023, Enigma directly confronted Prime about the rumors circulating in the industry regarding Prime's financial issues, clearly demonstrating that those rumors had reached Enigma.  Enigma contacted Prime because it wanted to "have a quick call with [Prime] to *discuss asap PT market rumors*":

| | |
|---|---|
| **From:** | Michael Halimi[mhalimi@makor-capital.com] |
| **Sent:** | Thur 6/8/2023 1:49:23 PM (UTC+01:00) |
| **To:** | ████████ @primetrust.com]  █ ██ @primetrust.com █ @primetrust.com] |
| **Cc:** | Rudy Perez[rudy@Enigma-securities.io]; Avi Bouhadana[abouhadana@makorsecurities.com] |
| **Subject:** | RE: Prime Trust-Enigma - |

Hi █████████

I would like to have  a quick call with you to discuss asap PT market rumors?

Let me know your availability

ty

Best
Michael h

**Michael Halimi**
CEO & Co-Founder
**Makor Securities London Ltd. | Makor Group**

92.     On that same day, Prime responded in an attempt to quell Enigma's concerns about

Prime's solvency, even admitting to Enigma that "***the entire market is concerned***":



From:            ■■■@primetrust.com]
Sent:            Thur 6/8/2023 3:47:38 PM (UTC+01:00)
To:              Michael Halimi[mhalimi@makor-capital.com]
Cc:              ■■■@primetrust.com]; Rudy Perez[rudy@enigma-securities.io];
                 Avi Bouhadana[abouhadana@makorsecurities.com]
Subject:         Re: Prime Trust-Enigma -

Michael,
As you can imagine, the entire market is concerned.  The most efficient and fair way to do this is
to release a public statement, which we plan to do.  Working on it internally already.  For
what it's worth, I think the market will generally receive it positively and it should calm the
industry down, although these days, one can never predict public sentiment.

From:            ■■■@primetrust.com]
Sent:            Thur 6/8/2023 4:07:26 PM (UTC+01:00)
To:              Michael Halimi[mhalimi@makor-capital.com]
Cc:              ■■■@primetrust.com[jor@primetrust.com]; Rudy Perez[rudy@enigma-
                 securities.io]; Avi Bouhadana[abouhadana@makorsecurities.com]
Subject:         Re: Prime Trust-Enigma -

Hi Michael,
Thank you for your email. The team internally is working on an update that we'll try to publish
later today, we believe it will help reduce the FUD in the marketplace. Let us know if you still
want to chat after the public statement goes out.

Appreciate your continued support.

Best,

--

**Chief of Staff**

93.     Prime's attempts to ease Enigma's worries did not work.  Approximately one week

later, on June 14, 2023, Enigma again reached out to Prime to ask if "everything [was] good on

[Prime's] side" and if it was "business as usual":



94.    Enigma's concerns this time stemmed from news that Banq., Inc. ("<u>Banq</u>"), a former Prime subsidiary company, had filed for bankruptcy.  Prime assured Enigma that the Banq bankruptcy would not affect the Parties' business.

95.    However, Enigma remained concerned about its business with Prime and again complained to Prime about delays in Prime completing requested wire transfers, stating that some wires had been "pending for 2[] hours":



96.    On June 15, 2023, Enigma followed up with Prime to complain that the process to complete requested transfers was "too slow":

Message

"Samuel Leyne" <"sleyne@enigma-securities.io"@Slack> To █████████████ ██primetrust.com"@Slack>, █████████ <█████████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com" <███████ ██primetrust.com"@Slack>, ██████ <██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack> <██████ ██primetrust.com" <██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████ ██primetrust.com" <██████ ██primetrust.com"@Slack>, ██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, ██████ ██primetrust.com"@Slack>, ██████████ ██primetrust.com"@Slack>, "jean-baptiste Mateo" <"jbmateo@Enigma-securities.io"@Slack>, "Benjamin Borello" <"bborello@enigma-securities.io"@Slack>, "Benjamin Konqui" <"bkonqui@enigma-securities.io"@Slack>, "Guy Augarde" <"gaugarde@enigma-securities.io"@Slack>

its too slow guys

*June 15, 2023 3:46 PM (Eastern)*

97.    Enigma also stressed the urgency with which it needed Prime to make its requested

transfers, stating to Prime multiple times that it "really needed" its "funds" to be "released":



| From: | "Samuel Leyne" <"sleyne@enigma-securities.io"@Slack> |
| Sent: | Thur 6/15/2023 8:22:28 PM (UTC) |
| To: | █████████████ ██primetrust.com"@Slack> |
| Subject: | Slack-13323335841 |

Direct Message

"Samuel Leyne" <"sleyne@enigma-securities.io"@Slack> To "██████████ <█████ ██primetrust.com"@Slack>

we really need to move funds around

*June 15, 2023 4:22 PM (Eastern)*

| From: | "jean-baptiste Mateo" <"jbmateo@Enigma-securities.io"@Slack> |
| Sent: | Thur 6/15/2023 8:36:18 PM (UTC) |
| To: | █████████████ ██primetrust.com"@Slack> |
| Subject: | Slack-13323311004 |

Direct Message

"jean-baptiste Mateo" <"jbmateo@Enigma-securities.io"@Slack> To ██████████ ██████ ██primetrust.com"@Slack>

We really need those wires to be released

*June 15, 2023 4:36 PM (Eastern)*

98.     Enigma's frustrations with Prime clearly mounted, with Enigma even stating to Prime that it "***need[ed] all funds to be released*** [*sic*] ***now !***":



need all funds to be release now !

*June 15, 2023 5:23 PM (Eastern)*

99.     These communications between the Parties strongly suggest that—either by way of Enigma's frustrations with its own business with Prime or by way of the myriad rumors circulating about Prime's condition—Enigma became aware of the fact that there were serious issues at Prime before the rest of the public, including Prime's other customers, found out.

**D.      The Preferential Transfers are Avoidable**

100.     Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

101.     First, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(1).

102.     Second, the transfer must be "for or account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

103.     Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

104.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

105.    Fifth, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

106.    The Transfers were transfers of an interest of Prime's property.  As established above, the Agreements did not create a trust or fiduciary relationship between Prime and Enigma.

107.    Prime made the Transfers to or for the benefit of Enigma, a creditor of Prime, by virtue of Prime's debtor-creditor relationship created by the Agreements.

108.    At the time of the Transfers, Prime owed Enigma fiat currency.  Thus, Prime made the Transfers on account of that antecedent debt.

109.    Prime made the Transfers while it was insolvent.  As of the Petition Date, Pime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[11]  Prime is nonetheless presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

110.    If not avoided, the Transfers will enable Enigma to receive more than Enigma would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers during the Preference Period in satisfaction of Prime's antecedent debt owed to Enigma.[12]

---

[11]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc.*, (Case No. 23-11161) [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC*, (Case No. 23-11162) [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC*, (Case No. 23-11164) [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC*, (Case No. 23-11168) [Docket No. 178].

[12]    *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

111.    Prime made the Transfers to Enigma during the 90-day Preference Period immediately preceding the Petition Date (*i.e.*, between May 16, 2023 and August 14, 2023).

112.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid certain of the Transfers even after taking into account Enigma's potential affirmative defenses.[13]

113.    Accordingly, certain of the Transfers to Enigma during the 90-day Preference Period immediately preceding the Petition Date constitute preferential transfers pursuant to section 547(b) of the Bankruptcy Code that are subject to avoidance pursuant to section 550 of the Bankruptcy Code.

114.    During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Enigma during Preference Period. It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Enigma or any other transferee.  PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Enigma's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

---

[13]   It is Enigma's obligation to establish any possible affirmative defenses, including any subsequent new value defense.

IV.    **Enigma Cannot Trace the Fiat it Transferred to Prime**

    A.    **Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name and Maintained Poor Reconciliations Processes**

115.    The fiat that Enigma and other customers transferred to Prime was not segregated into separate bank accounts.  *See* Ex. C, Brennan Decl., ¶ 16.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id*.

116.    Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), Royal Business Bank ("RBB") and Lexicon Bank ("Lexicon").  *See id.*, ¶ 12.

117.    Prime made the Transfers during the Preference Period to Enigma from one of Prime's BMO accounts ("BMO x3077").  *See* Ex. C, Brennan Decl., ¶ 69.  *See also* Ex. D, Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement").[14]  Enigma's incoming transfers to Prime during the Preference Period went to BMO x3077 and one Prime CRB account ("CRB x9892").  *See* Ex. C, Brennan Decl., ¶ 69.

118.    The BMO Agreement specifically provides that the BMO Agreement  "***is not for the benefit of any other person and no other person shall have any right against [Prime] or [BMO Harris] hereunder***."  See Ex. D, BMO Agreement, § 15(e) (emphasis added).

119.    The BMO Agreement does not state that fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See id.*

---

[14]    A copy of the BMO Agreement is attached as Exhibit D.

120.    Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided." *See* Ex. E, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Certification").[15]

121.    Prime regularly transferred fiat between its various omnibus bank accounts, further commingling funds. *See* Ex. C, Brennan Decl., ¶¶ 18–30.

122.    For example, Prime used BMO x3077 primarily to make wire transfers. *See id.*, ¶ 21.

123.    BMO x3077 held commingled funds that it regularly received from other Prime omnibus bank accounts and from other Prime customers. *See id.*, ¶ 22.

124.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[16] *See id.*, ¶¶ 24–25.

125.    The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077. *See id.*, ¶ 25.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds. *See id.*, ¶¶ 24–25.

126.    In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature. *See id.*, ¶ 25.

---

[15]    A copy of the BMO Certification is attached as Exhibit E.

[16]    BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion." *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit F, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements). *See* Ex. E, BMO Certification.

127.    Prime's omnibus accounts at CRB operated in a similar manner to BMO x377.  *See id.*, 26.  Specifically, Prime's CRB accounts commingled funds that were transferred to them from Prime's other omnibus bank accounts and commingled funds that Prime customers had transferred to the accounts directly.  *Id.*

128.    Prime used CRB x9892 in the same way it used BMO x3077, except that Prime funded CRB x9892 on an as-needed basis to make transfers via automated clearinghouse ("ACH") instead of via wire.  *See id.*, ¶ 27.

129.    Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.*, ¶¶ 19, 27.

130.    Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.*, ¶ 29.  This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

131.    Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.*, ¶ 16.

132.    Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *See id.*, ¶ 17.

133.    However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See id.*, ¶ 23.

134.    ████████ ("█████"), Prime's former Chief of Regulatory Affairs, testified

that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime

owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual
> customer at a particular time versus how much cash and crypto Prime Trust
> had in its possession, how would we do that?

> A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov.

16, 2023) (the "█████ Dep."), 89: 19–25.

135.    Prime maintained substandard reconciliation processes throughout its history,

including with respect to its Internal Ledger.  *See* <u>Ex. C</u>, Brennan Decl., ¶¶ 31–43.  This further

hindered the ability of Prime or anyone else to specifically identify which funds were transferred

to Prime by which customer.  *Id.*

136.    Prime did not perform regular reconciliations of its assets and, at least prior to

March 2021, any reconciliations that Prime did conduct were manual.  *See id.*, ¶ 31.

137.    Former Prime employees testified that Prime commingled fiat and crypto

transferred to Prime by its customers and that Prime's reconciliation processes were poorly

maintained.

138.    ████ testified that "[r]econciliations were not being done in a timely manner."

████ Dep., 38: 23–24.

139.    ████████ ("█████"), Prime's former Chief Financial Officer, testified:

> Q:    Are you aware of any instances in which what would be considered
> customer assets were commingled with company assets in an account?

> A:    I think there were instances where that did happen based off of the
> management in the financial operations team where we might have had

balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

140.    ██████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been."  *See id.*, 213:15–22.

141.    ██████ also testified about Prime's reconciliations processes both before and after March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

██████ Dep., 19:23–20:5.

142.    ██████ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

**2    Finding and Response Summary Matrix**

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|------|-----------|---------|--------|----------|-----------|----------|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

143.    The below testimony from ████ demonstrates that Prime's regular practices of commingling assets and maintaining poor records resulted in Prime's own employees being incapable of determining exactly where assets transferred by a particular party were located:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:    And that was done at Prime Trust?

A:    It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed

customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

███ Dep., 205:19–207:3.

### B. The 98f Wallet

144.    In December 2021, Plutus Financial Inc. d/b/a Abra ("Abra") requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime.  *See* Ex. C, Brennan Decl., ¶ 45.  Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000 at the time). *See id.*, ¶ 49.

145.    In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:

> ███@primetrust.com
> 2021-12-22 07:16:57.000 PM
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know ███ and ███ ██████re investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

146.    Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

147.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet.  *See* Ex. C, Brennan Decl., ¶ 46.

148.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.

149.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ████ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet.  *See* ████ Dep., 181:6–8.  Prime also did not possess and could not locate the passwords (called "seed phrases") that were associated with these physical hardware devices connected to the 98f Wallet.  *See id*.

150.    As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

151.    Prime was concerned about the negative impact and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

152.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.  *See* Ex. C, Brennan Decl., ¶ 47.

153.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's withdrawal requests as reflected in the chart below.  *See id.*, ¶ 49.

| Date | ETH On-Chain Transfers |
|------|------------------------|
| 12/23/2021 | 2,999.99 |
| 12/31/2021 | 3,250 |
| 1/6/2022 | 800 |
| 1/6/2022 | 2,100 |

| 1/21/2022 | 1,930.50 |
|-----------|----------|
| 3/11/2022 | 1,800 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000 |
| 3/29/2022 | 2,347.22 |
| 3/30/2022 | 2,300 |

154.   The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers. *See id.*, ¶ 50.

155.   The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ███████:

> Q:   So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:   I would defer to ███ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:   What's use of omnibus funds?
>
> A:   As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:   And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:   Funds from the fiat account.  Fiat omnibus account.  Is my understanding.  Once again, ███ would know specifically.

Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

156.   The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.  *See* <u>Ex. C</u>, Brennan Decl., ¶ 52.  Thus, it is indisputable that the

ETH that Prime transferred to Abra to satisfy its withdrawal requests could not be the same ETH that Abra had originally transferred to Prime. *See id.*

### C.   Prime Ultimately Corrupted and Falsified its Internal Ledger to Conceal Its Actions with Respect to the 98f Wallet

157.   Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Abra's withdrawal requests related to the 98f Wallet. *See* Ex. C, Brennan Decl., ¶ 53.

158.   Prime executives discussed how to hide these transactions from auditors at Nevada FID:



159.   ■ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from the Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider. *See* ■ Dep., 153:8–13.

160.     Specifically, Prime settled its ETH purchases from the Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance at Prime with fiat amounts equivalent to each ETH purchase. *See id.* at 204:16–21. To "credit" Liquidity Provider's fiat balance with Prime, Prime had to input a "contribution" on its Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime. *See id*. at 155:11–156:9. In reality, no funds were moving from one account to another in connection with the ETH purchases.

161.     ████ testified:

A:     So let me—let me make sure I understand what you said. You said how to get money to Abra. You meant how to get money to [Liquidity Provider]; right?

A:     Sorry, yeah, that's what I meant. [Liquidity Provider].

Q:     Okay. So in order to credit [Liquidity Provider]'s cash account at Prime, there needed to be a contribution on the internal Ledger; is that right?

A:     Correct.

Q:     And once there is a contribution to the internal Ledger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:     Correct.

Q:     There's not actually any more cash in the bank account; right?

A:     No, there is no—there is no credit of that money to the bank accounts, only to the Ledger.

*Id*.

162.     These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See id*.



163.    ▮ further testified about Prime's internal "inflat[ed]" Internal Ledger compared

to the fiat in Prime's omnibus bank accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but
        that cash is not actually in the bank; is that right?

A:    Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to
        withdraw, that's just in the omnibus cash account, that has everybody
        else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see.  But the Ledger would show an amount owed to your customers that's
        higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

▮ Dep., 144:11–20, 146:7–15.

164.    ▮ explained that Prime chose to record its purchases of ETH from Liquidity

Provider to satisfy the transfer requests of Abra on Prime's Internal Ledger because that approach

made it easier for Prime to avoid detection from Nevada FID:

Q:    And FID is Nevada Financial Institution Division; right?

A:    I think so.  Yeah.

Q:    And so, what is ███ talking about when he's saying "minimizing FID scrutiny during audit time"?

A:    It wasn't a—I think what he's saying is, you know, when FID comes to do their regular—regulatory reviews with us, you know, how do—how do they get around—or not get around, but how do they minimize, you know, the scrutiny that FID would come down on Prime Trust for doing this.

Q:    So ███ saying, it sounds like, it would be easier to hide it from FID if we do it internally as opposed to externally; is that right?

A:    That's—that's what he was trying to do, yeah.

███ Dep., 152:18–153:13.

165.    Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.  *See* Ex. C, Brennan Decl., ¶¶ 53–62.

166.    As demonstrated by the illustrative chart below[17], Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

*See id.*, ¶ 62.

---

[17]    This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

167.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.[18]  *See id.*, ¶ 59.

168.    Prime's Internal Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021, and $12,158,250.00 on December 31, 2021.  *See id.*, ¶ 60.

169.    These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.  *Id.*

170.    However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021.  *Id.*

171.    The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Abra's transfer requests.

172.    These false accounting entries were confirmed by ███, who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Internal Ledger:

> Q:    When it says funds transfer in column F and it says "wire, wire, wire."  Do you see that?
>
> A:    Yes.
>
> Q:    There were no wire transfers; right?
>
> A:    Yes.
>
> Q:    Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?

---

[18]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as <u>Exhibit G</u>.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as <u>Exhibit H</u>.

A:      Yes, there were no wire transfers.

. . .

Q:      And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?

A:      Correct.

Q:      And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?

A:      No wire transfers in.

■■■ Dep., 164:22–165:10; 166:5–15.

173.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.  *See* <u>Ex. C</u>, Brennan Decl., ¶ 62.

174.    For example, another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from Abra:



175.   ████ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ████████ @primetrust.com> wrote:
>
> Hey ████
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

176.   ████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "*not able to specify what customer is out the funds due to our omnibus structure*":

> On Wed, Dec 28, 2022 at 10:56 AM ███████████ ████████ @primetrust.com> wrote:
>
> ███ and I met today. We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure. Please let us know if we need to have another conversation to align how to position this with the FID.

177.    As is demonstrated by the abundance of ███ testimony cited in this Complaint, ███ corroborated many of the facts related to Prime's problem with the 98f Wallet, use of fiat transferred by other customers to purchase replacement ETH, and intentional falsification of records.

178.    ███ was intimately involved with all of these events: (i) he was the first person at Prime to discover that there was a problem with the 98f Wallet, (ii) he was the person who actually executed each of the replacement ETH purchases with Liquidity Provider, and (iii) he was the person who falsified Prime's Internal Ledger.

179.    While ███ claims to have been acting largely at the direction of others at Prime, it is clear that he was undoubtedly aware of the full extent of Prime's issues from the very beginning.

180.    Interestingly enough, in September 2023, ███ joined Enigma as Head of Business Development for the Americas.

181.    This was shortly after Prime filed the Chapter 11 Cases and not long after Enigma was able to get tens of millions of dollars off of Prime's platform before Prime shut its doors to all its customers—many of whom were not as lucky as Enigma.

**D.    Due to Prime's Commingling of Funds, Negligent Recordkeeping, and Intentional Corruption of its Internal Ledger, It is Impossible to Trace the Fiat Enigma Transferred to Prime**

182.    Because of Prime's commingling of fiat, Prime's poor recordkeeping procedures, and Prime's intentional falsification of its own records, it is impossible for Plaintiff, Enigma, or

anyone else to trace and specifically identify the fiat that Enigma originally had transferred to Prime. *See generally* <u>Ex. C</u>, Brennan Decl.

183.     Additionally, the Brennan Decl. further demonstrates that fiat Enigma transferred to Prime is impossible to trace. *See id.*, ¶¶ 63–108.

184.     Prime executed all of the outgoing Transfers to Enigma during the Preference Period from Prime's BMO x3077 account. *See id.*, ¶ 69.

185.     Enigma sent all of its incoming wire transfers to Prime during the Preference Period to either BMO x3077 and CRB x9892. *See id.*

186.     As explained above, BMO x3077 and CRB x9892 were both comprised of heavily commingled funds from various sources. *See id.*, ¶¶ 21–27.

187.     The Brennan Decl. illustrates the effect that Prime's commingling had on the fiat that comprised the Transfers by examining deposit and withdrawal activity for both BMO x3077 and CRB x9892 over a five-day period during the Preference Period (*i.e.*, May 16, 2023, May 17, 2023, May 19, 2023, June 15, 2023, and June 20, 2023). *See id.*, ¶¶ 75–108.

188.     The deposit and withdrawal activity at Prime during these five days demonstrates that it is impossible to trace the fiat that Enigma received through the Transfers with any of the fiat that Enigma originally provided to Prime. *Id.*

189.     Thus, as the Brennan Decl. demonstrates through its analysis of Prime's history, procedures, and transaction activity during the Preference Period: (i) Prime commingled the fiat currency that Enigma provided to Prime, and (ii) because of this, it is impossible to determine whether any of the funds Enigma received through the Transfers consisted of the same funds Enigma initially transferred to Prime. *See id.*, ¶ 108.

190.    Additionally, on July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "Distribution Order").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "Distribution Opinion").

191.    In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors were property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "Objectors") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

192.    In overruling these objections, the Court made several findings pertinent to the instant matter.

193.    First, the Court held that the agreements "submitted into evidence [by the Objectors] do not establish a trust relationship exists" between Prime and its customers.  *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

194.    The agreements analyzed by the Court in the Distribution Order contain identical provisions to the Agreements at issue here and discussed above.  *See id.* at 24.

195.    Second, the Court held that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified" and that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets." *Id.* at 23–24.  The Court found that "the fiat held by the Debtors is not traceable" and "the hopeless commingling would not allow the cryptocurrency to be traced."  *Id.* at 27, 30.

196.    As set forth above, the Transfers from Prime to Enigma cannot be traced to Enigma's original fiat transfers to Prime.

**V.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases**

197.    Prime ultimately reported the 98f Wallet issues to Nevada FID between September and November 2022.

198.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

199.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

200.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8, 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

201.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."  *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21,

2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf. Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

202.    The next day, BitGo canceled its acquisition of Prime. One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

203.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "<u>Nevada FID Petition</u>") in the Eighth Judicial District Court of the State of Nevada (the "<u>Nevada Court</u>"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf. The Nevada FID Petition directed Prime to cease and desist all retail trust activities. *Id.*

204.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

205.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***." *Id.* at 6 (emphasis added).

206.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

207.    On July 14, 2023, the Nevada Court placed Prime under receivership.

208.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I

**Avoidance of Preferential Transfers to Defendants,
11 U.S.C. § 547(b)**

209.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

210.    The Transfers were made on account of a demand by Enigma.

211.    Each of the Transfers was a transfer of an interest in property of Prime.

212.    Prime made the Transfers to or for the benefit of Enigma.

213.    At the time of the Transfers, Enigma was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  Enigma received the Transfers, or, alternatively, the Transfers were made for Enigma's benefit.

214.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

215.    Each of the Transfers was made within 90 days of the Petition Date

216.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable Enigma to receive more than Enigma would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

217.    Enigma has not repaid or returned any of the Transfers to Plaintiff.

218.    Pursuant to 11 U.S.C. § 547(b), Plaintiff has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Enigma could assert, including Enigma's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

219.    Accordingly, Plaintiff is entitled to recover from Enigma not less than $93,576,258.70 of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

## Count II

### Recovery of Avoided Transfers from Defendants,
### 11 U.S.C. § 550

220.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

221.    Plaintiff is entitled to avoid the preferential transfers described above pursuant to Sections 547(b) of the Bankruptcy Code.  Enigma was the initial transferee of such transfers, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfers was made.

222.    Accordingly, pursuant to section 550 of the Bankruptcy Code, Plaintiff is entitled to recover from Enigma: not less than $93,576,258.70 USD of the Transfers as preferences

pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## Count III

### Claim Objection,
### 11 U.S.C. § 502

223.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

224.    As alleged above, Enigma was the initial transferees of the Transfers, or the immediate or mediate transferees of such initial transferees, or the persons for whose benefit the Transfers were made, and Plaintiff is entitled to avoid certain of the Transfers described above pursuant to section 547(b) and of the Bankruptcy Code, which are recoverable from Enigma under section 550 of the Bankruptcy Code.

225.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Enigma that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Enigma pays Plaintiff the value of the Transfers, for which and to the extent that the Court has determined Enigma is liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

A.      Enter an order finding that the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.      Award PCT: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers

alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to Enigma;

      C.      Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Enigma against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Enigma relinquishes to PCT the amount ordered as an award for avoidable transfers;

      D.      Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

      E.      Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated:  October 10, 2025
        Wilmington, Delaware

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:     dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:     dazman@mwe.com
           jbevans@mwe.com
           jpardo@mwe.com
           ggriffith@mwe.com
           pkennedy@mwe.com
           mduque@mwe.com
           jaminov@mwe.com

*Counsel to PCT Litigation Trust*